**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | | |
|---|---|---|
| VICTOR LOZANO, individually and on behalf of a class of similarly situated individuals, | ) ) ) | |
| | ) | No. 1:09-cv-06344 |
| *Plaintiff*, | ) ) | |
| v. | ) ) | |
| TWENTIETH CENTURY FOX FILM CORP., a Delaware corporation, TWENTIETH CENTURY FOX HOME ENTERTAINMENT LLC D/B/A FOXSTORE.COM, a Delaware limited liability company, | ) ) ) ) ) ) | Honorable Amy J. St. Eve |
| *Defendants*. | ) ) | |

---

**PLAINTIFFS' UNCONTESTED MOTION & MEMORANDUM IN SUPPORT OF FINAL APPROVAL OF CLASS ACTION SETTLEMENT, APPROVAL OF ATTORNEY'S FEES, AND INCENTIVE AWARD**

---

Jay Edelson
Myles McGuire
Ryan D. Andrews
Michael J. McMorrow
EDELSON MCGUIRE LLC
350 North LaSalle Street, Suite. 1300
Chicago, Illinois 60654

*Attorneys for Plaintiff and the Class*

## TABLE OF CONTENTS

INTRODUCTION ......................................................................................................1

I.  NATURE OF THE LITIGATION ..................................................................3

    1.  *Plaintiff's Complaint & the Litigation History* .................................3

    2.  *The Mediation & the Settlement Agreement* ....................................4

II. TERMS OF THE SETTLEMENT ...................................................................4

    1.  *Class Definition* ...............................................................................5

    2.  *Class Member Payments* ..................................................................5

    3.  *Additional Relief* .............................................................................5

        A.  Payment of Notice and Settlement Administration Expenses ...............5

        B.  Incentive Award for Class Representative ................................5

        C.  Payment of Attorneys' Fees ...............................................6

    4.  *The Release* ......................................................................................6

III. THE IMPLEMENTED NOTICE PLAN COMPORTS WITH DUE PROCESS .......6

IV. THE SETTLEMENT WARRANTS FINAL APPROVAL .........................8

    1.  *The Strength of the Plaintiff's Case Compared to Settlement Weighs in Favor of Granting Approval* .......................................9

    2.  *The Likelihood of an Increase in the Complexity, Length, and Expense of Continued Litigation Validates the Approval of the Settlement* ..........11

    3.  *There has been no Opposition to the Settlement* ..................12

    4.  *The Opinion of Competent Counsel Favors Approval* .......................13

    5.  *The Stage of the Proceedings and the Amount of Discovery Completed Weigh in Favor of Final Approval of the Settlement* ...........................14

V.  ATTORENYS' FEES & INCENTIVE AWARDS .....................................15

    1.  *The Requested Attorneys' Fees are Reasonable Whether Calculated Under Either the Percentage of the Benefit Analysis or the Lodestar Method* .............15

**A.** **The Requested Fees Represent Under 25% of the Common Benefit Provided to the Class—a Percentage Well Below Market and the Range that has been Found Reasonable by the Courts** ........................18

**B.** **The Requested Fees are Equally Appropriate Under the Lodestar Method** ................................................................................................19

**2.** ***The Incentive Award to the Class Representative is Reasonable and Should be Approved*** ....................................................................................23

**CONCLUSION** ..........................................................................................................24

## TABLE OF AUTHORITIES

### Cases

*Abbas v. Selling Source, LLC*,
  No. 09 CV 3413, 2009 WL 4884471 (N.D. Ill. Dec. 14, 2009) .......................................10

*Am. Civil Liberties Union v. United States Gen. Servs. Admin.*,
  235 F. Supp. 2d 816 (N.D. Ill. 2002) ...............................................................................12

*Arenson v. Board of Trade of City of Chicago*,
  372 F. Supp. 1349 (N.D. Ill. 1974) ...................................................................................21

*Boeing Co. v. Van Gemert*,
  444 U.S. 472 (1980)..................................................................................................16, 18

*Burns v. Elrod*,
  757 F.2d 151 (7th Cir. 1985) ..............................................................................................6

*Cook v. Niedert*,
  142 F.3d 1004 (7th Cir. 1998) .....................................................................................20, 23

*Cohn v. Nelson*,
  375 F. Supp. 2d 844 (E.D. Mo. 2005) ...............................................................................20

*Denius v. Dunlap*,
  330 F.3d 919 (7th Cir. 2003) ......................................................................................20, 22

*Di Giacomo v. Plains All Am. Pipeline*,
  No. H-99-4137, 2001 WL 34633373 (S.D. Tex. Dec. 19, 2001) .......................................20

*E.E.O.C. v. Hiram Walker & Sons, Inc.*,
  768 F.2d 884 (7th Cir. 1985) ..............................................................................................9

*Eisen v. Carlisle & Jacquelin*,
  417 U.S. 156 (1974)............................................................................................................6

*Florin v. Nationsbank of Ga., N.A.*,
  34 F.3d 650 (7th Cir. 1994) ..............................................................................................16

*Garner v. State Farm Mut. Auto. Ins. Co.*,
  CV-08-1365 CW (EMC), 2010 WL 1687832 (N.D. Cal. Apr. 22, 2010) .........................13

*Gaskill v. Gordon*,
  160 F.3d 361 (7th Cir. 1998) ............................................................................................19

*Gastineau v. Wright*,
   592 F.3d 747 (7th Cir. 2010) ........................................................................................19, 20

*Harman v. Lyphomed, Inc.*,
   945 F.2d 969 (7th Cir. 1991) .................................................................................................20

*Hensley v. Eckerhart,*
   461 U.S. 424 (1983)................................................................................................................19

*Hispanics United v. Vill. of Addison*,
   988 F. Supp. 1130 (N.D. Ill. 1997) .......................................................................................13

*In re AremisSoft Corp. Sec. Litig.*,
   210 F.R.D. 109 (D.N.J. 2002)................................................................................................20

*In re AT&T Mobility Wireless Data Services Litig.*,
   270 F.R.D. 330 (N.D. Ill. 2010)..............................................................................6, 9, 10, 14

*In re Cenco, Inc. Sec. Litig.*,
   519 F. Supp. 322 (N.D. Ill. 1981) .........................................................................................21

*In re JPMorgan Chase & Co. Sec. Litig.,*
   No. 06 C 4674, 2009 WL 537062 (N.D. Ill. Mar. 3, 2009) ....................................................9

*In re Lawnmower Engine Horsepower Mktg. & Sales Practices Litig.*,
   733 F. Supp. 2d 997 (E.D. Wis. 2010)....................................................................................9

*In re Linerboard Antitrust Litig.*,
   No. 98-5055, 2004 WL 1221350 (E.D. Pa. Jun. 2, 2004)....................................................20

*In re Mexico Money Transfer Litig.,*
   164 F. Supp. 2d 1002 (N.D. Ill. 2000) ......................................................................11, 12, 19

*In re NASDAQ Market-Makers Antitrust Litig.*,
   187 F.R.D. 465 (S.D.N.Y. 1998) ..........................................................................................20

*In re Rite Aid Corp. Sec. Litig.*,
   146 F. Supp. 2d 706 (E.D. Pa. 2001) ....................................................................................20

*In re Synthroid Mktg. Litig.*,
   264 F.3d 712 (7th Cir. 2001) .....................................................................................15, 16, 23

*In re Trans Union Corp. Privacy Litig.*,
   MDL 1350, No. 00 C 4279, 2009 WL 4799954 (N.D. Ill. Dec. 9, 2009) ...........................16

*In re Xcel Energy, Inc., Sec., Derivative & "ERISA" Litig.*,

364 F. Supp. 2d 980 (D. Minn. Apr. 8, 2005) ...................................................................20

*Isby v. Bayh*,
75 F.3d 1191 (7th Cir. 1996) .........................................................9, 11, 13, 14

*Jeffboat, LLC v. Director, Office of Workers' Comp. Programs*,
553 F.3d 487 (7th Cir. 2009) .....................................................................20

*Kirchoff v. Flynn*,
786 F.2d 320 (7th Cir. 1986) ......................................................................17

*Kramer v. Autobytel, Inc*, --- F. Supp. 2d. ---,
No. 10-cv-2722 CW, 2010 WL 5463116 (N.D. Cal. Dec. 29, 2010) ...............................10

*Lipuma v. Am. Express Co.*,
406 F. Supp. 2d 1298 (S.D. Fla. 2005) ................................................10, 11, 14

*Maley v. Del Global Tech. Corp.*
186 F. Supp. 2d 358 (S.D.N.Y. 2002) ............................................................20

*Mangone v. First USA Bank*,
206 F.R.D. 222 (S.D. Ill. 2001) ...............................................................6, 14

*Meyenburg v. Exxon Mobil Corp.*,
No. 05-cv-15 DGW, 2006 WL 2191422 (S.D. Ill. July 31, 2006) .................................18

*Mirfasihi v. Fleet Mortg. Corp.*,
356 F.3d 781 (7th Cir. 2004) .......................................................................7

*Missouri v. Jenkins*,
491 U.S. 274 (1989) ...............................................................................17

*Montgomery v. Aetna Plywood, Inc.*,
231 F.3d 399 (7th Cir. 2000) ......................................................................16

*Retsky Family Ltd. P'ship v. Price Waterhouse LLP*,
97 C 7694, 2001 WL 1568856 (N.D. Ill. Dec. 10, 2001) ...........................................17

*Roberts v. Texaco, Inc.*,
979 F. Supp. 185 (S.D.N.Y. 1997) .................................................................20

*Ryan v. City of Chicago*,
274 Ill. App. 3d 913, 654 N.E.2d 483 (1995) .....................................................20

*Satterfield v. Simon & Schuster*,
569 F.3d 946 (9th Cir. 2009) ......................................................................10

*Satterfield v. Simon & Schuster, Inc. et al.*,
  No. 06-cv-02893-CW (N.D. Cal.) ...........................................................................15, 24

*Skelton v. Gen. Motors Corp.*,
  860 F.2d 250 (7th Cir. 1988) ...........................................................................16, 17, 20

*Spicer v. Chicago Bd. Options Exch., Inc.*,
  844 F. Supp. 1226 (N.D. Ill. 1993) ...........................................................................19

*Stop & Shop Supermarket Co. v. SmithKline Beecham Corp.*,
  No. 03-4578, 2005 WL 1213926 (E.D. Pa. May 19, 2005).............................................20

*Sutton v. Bernard*,
  504 F.3d 688 (7th Cir. 2007) ...........................................................................15, 16

*Synfuel Techs., Inc. v. DHL Express (USA), Inc.*,
  463 F.3d 646 (7th Cir. 2006) ...........................................................................9, 10

*Taubenfeld v. AON Corp.*,
  415 F.3d 597 (7th Cir. 2005) ...........................................................................16

*Teamsters Local Union No. 604 v. Inter-Rail Transport, Inc.*,
  02-cv-1109 DRH, 2004 WL 768658 (S.D. Ill. Mar. 19, 2004) ......................................18

*Uhl v. Thoroughbred Tech. & Telecomms., Inc.*,
  309 F.3d 978 (7th Cir. 2002) ...........................................................................9

*Weinstein v. The Timberland Co. et al.*,
  No. 06-cv-00484 (N.D. Ill.) ...........................................................................15, 24

*Williams v. Gen. Elec. Capital Auto Lease*,
  94 C 7410, 1995 WL 765266 (N.D. Ill. 1995)...............................................................16

## **Statutes**

Fed. R. Civ. P. 23 ...........................................................................2, 6, 8, 9

28 U.S.C. § 1715...........................................................................8, 13

47 U.S.C. § 227, *et seq*...........................................................................1, 10

**<u>Other Sources</u>**

2 Newberg on Class Actions § 1.18 (3d Ed. 1992)........................................................................18

*In re Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991*,
    18 FCC Rcd 14014, 14115, 165, 2003 WL 21517853 (2003).........................................10

Amanda Lenhart, *Cell Phones and American Adults: They Make Just as Many Calls, but Text
    Less than Teens*, Pew Research Center (2010) .................................................................1

Thomas E. Willging, Laural L. Hooper & Robert J. Niemic, *Empirical Study of Class Actions in
    Four Federal District Courts:  Final Report to the Advisory Committee on Civil Rules*, at
    69 (Federal Judicial Center 1996).....................................................................................19

Richard Posner, Economic Analysis of Law § 21.9, at 534-35 (3d ed. 1986).............................17

## <u>INTRODUCTION</u>

The widespread use of cellular telephones has fundamentally changed the way individuals communicate. Americans use cellular phones not only to make traditional voice calls, but also to communicate via text message.[1] Marketers and advertisers have seized upon this opportunity recognizing the potential to advertise their products directly to tens of thousands of individuals at a very low cost. But not all of these communications are invited. Text message advertising has given rise to text message spam; a recent Pew Research Center Report found that 57% of adults with cell phones have received unwanted, or "spam" text messages on their phone.[2] Plaintiff's class action arises out of this new advertising landscape and asserts that federal law prohibits this conduct.

On September 11, 2009, Plaintiff Lozano filed a class action lawsuit alleging that Defendants Twentieth Century Fox Film Corp. and Twentieth Century Fox Home Entertainment LLC d/b/a FoxStore.com (collectively "Defendants") transmitted a text message to consumers' cell phones advertising the DVD release of the motion picture *Robots*[3] in violation of the Telephone Consumer Protection Act, 47 U.S.C. § 227, *et seq*. ("TCPA"). (*See* Dkt. 1-4.) On June 2, 2010, the parties participated in a daylong mediation with retired United States District Court Judge Nicholas Politan. After a full day of arms'-length negotiations, the parties were unable to reach an agreement on the terms of a settlement and Judge Politan made a mediator's

---

[1] Text messaging—also known as "SMS," or "Short Message Service"—is a messaging system that in normal use allows cellular telephones to send and receive short text messages, usually limited to 160 or so characters, on their cellular telephones. A text message call, when directed to a cell phone through the use of the telephone number assigned to the device, causes the phone to ring or otherwise alert called party that a text message has been received.

[2] Amanda Lenhart, *Cell Phones and American Adults: They Make Just as Many Calls, but Text Less than Teens*, Pew Research Center (2010).

[3] Released on DVD on September 27, 2005, *Robots* is an animated motion picture set in a futuristic robot world where a young idealistic inventor travels to the big city to join his inspiration's company, only to find himself opposing its sinister new management.

proposal. The Parties accepted Judge Politan's proposal as to the principal terms of the agreement. Thereafter, numerous drafts were exchanged and six status hearings were held before the Settlement Agreement was ultimately executed and presented to the Court for preliminary approval. (*See* Dkts. 48, 50, 52, 53, 54, & 56; *see also* Class Action Settlement Agreement (the "Agreement"), a true and accurate copy of which is attached as Exhibit 1.) At points during this process it was unclear if the settlement reached at mediation would be effectuated and Class Counsel, while continuing to negotiate the minutia of the Agreement's terms with Defendants' counsel, also actively prepared for a potential lifting of the stay of all proceedings and a return to litigation.

On November 17, 2010, the Court granted preliminary approval finding "the Settlement Agreement is fair, reasonable, adequate, and in the best interests of the Settlement Class." (Dkt. 57, ¶ 1.) The Court further approved the robust notice plan set-forth in the Agreement finding it was the best practicable notice under the circumstances and was fully complaint with Due Process and Rule 23. (*Id.*) The notice plan has been successfully implemented, and the deadline for the submission of requests for exclusion and objections has expired. There has been an overwhelmingly favorable reaction to the Agreement by the Class—there have been no objections and only four purported requests for exclusion.

The settlement has achieved exceptional results for the Class, providing each Class Member who received an unsolicited text message relating to Defendants' motion picture *Robots* and submits a valid claim by May 30, 2011, a $200 cash settlement payment from the $16 million settlement fund that will also be used to cover the costs of notice, administrative expenses, incentive award, and attorneys' fees. Although the substantial monetary payments made available to the Class, their favorable reaction to the settlement, and the inherent risk

attendant in continued litigation of a complex class action each favor final approval, the Court

need not rule on a blank slate in deciding the fairness, reasonableness, and adequacy of this

agreement, as it is predicated on similar agreements approved in this District, as well as in

Florida and California federal courts.

Accordingly, Plaintiff Lozano respectfully requests the Court grant final approval of the

Agreement dismissing the Released Claims with Prejudice, and awarding the agreed-upon

attorneys' fees and incentive award.

## I.    NATURE OF THE LITIGATION

### 1.    *Plaintiff's Complaint & the Litigation History*

In January 2009, Plaintiff Lozano began investigation into his claims in the instant class

action, which was filed September 9, 2009, in the Circuit Court of Cook County, Illinois.  (Dkt.

1-4.)  On October 9, 2009, Defendants removed the case to this Court pursuant to 28 U.S.C §

1331.  (Dkt. 1.)  Plaintiff's complaint asserted a single cause of action under the TCPA alleging

that Defendants' implemented a marketing campaign that caused unsolicited text messages

advertising the DVD release of the motion picture *Robots* to be sent to the cellular phones of

thousands of consumers.  (*See* Dkt. 1-4.)

On March 23, 2010, this Court denied Defendants' motion to dismiss in its entirely in a

cogent published decision, which has since been followed by several other courts.  (Dkts. 14-15,

40.)  Defendants subsequently answered the Complaint and asserted numerous potentially viable

affirmative defenses.  (Dkt. 44.)  During the parties' Rule 26(f) conference that followed the

Court's ruling, the parties agreed to enter into private mediation with well-respected mediator

Judge Politan.  (*See* Dkt. 45.)  Nevertheless, the parties each propounded several sets of class and

merits-based discovery.  In advance of the mediation, however, the parties entered into an

agreement to informally exchange certain documents and other information that would be needed to fully educate each party on the strength of their respective cases and effectively engage in the mediation process. (*See* Declaration of Jay Edelson ¶ 7, a true and accurate copy of which is attached as Exhibit 2.)

### 2. *The Mediation & the Settlement Agreement*

On June 2, 2010, Class Counsel, Defendants' counsel, representatives from Fox, and Defendants' insurer met in New York City for a formal mediation with Judge Politan. After the conclusion of a full day of arm's-length negotiations the parties were at impasse. Just prior to concluding the mediation, Judge Politan made a mediator's proposal as to the principal terms of this Agreement, which was independently accepted by counsel for Plaintiff and Defendants. (Edelson Decl. ¶ 8.)

Despite reaching an accord on the core settlement terms in June 2010, the parties exchanged drafts of the Agreement for several months and appeared before the Court six times to report their progress toward resolution. (*See* Edelson Decl. ¶ 9; Dkts. 48, 50, 52, 53, 54, & 56.) In anticipation of the likely possibility that the Court would lift the stay of proceeding entered when it was initially reported the matter had settled, Class Counsel prepared for a return to litigation by preparing answers to Defendants' discovery and drafting class certification papers for filing upon the removal of the stay of litigation imposed by the Court. (Edelson Decl. ¶ 10.) Fortunately, the Parties and Defendants' insurer signed off on the Agreement at the eleventh-hour, and the Court granted preliminary approval on November 17, 2010. (Dkt. 57.)

## II.   <u>TERMS OF THE SETTLEMENT</u>

The terms of the settlement preliminarily approved by the Court are set forth in the Agreement attached hereto as Exhibit 1 and briefly summarized as follows:

1.    ***Class Definition.***  At preliminary approval the Court certified a class consisting of all Persons Nationwide who in September or October of 2005 were sent a text message that stated:

> GEAR UP 4 THE HILARIOUS ANIMATED FILM ROBOTS ON DVD
> @FOXSTORE.COM. TAKE AN EXTRA $5 OFF THE ALREADY
> LOW PRICE BY USING COUPON CODE ROBOFOX
> PWRDBYZINGY

(Dkt. 1, Ex. A, ¶ 15; Agreement ¶¶ Recital A & 1.36.)

2.    ***Class Member Payments.***  Defendants will cause to be made $200 settlement payments to each class member who submits a valid claim form by May 30, 2011, from a $16 million Settlement Fund.  However, the Agreement provides for an alternative *pro rata* payment if the total amount of claims, the incentive award to Plaintiff, attorneys' fees, and settlement administration expenses exhausts the Settlement Fund.  (Agreement ¶ 2.1.)

3.    ***Additional Relief.***  In addition to the individual monetary payments to the settlement class discussed above, Defendants have also agreed to provide the following additional relief:

A.    **Payment of Notice and Settlement Administration Expenses**:
Defendants will pay from the Settlement Fund the cost of sending the notice approved by the Court and will continue to pay all expenses incurred by the settlement administrator, Rosenthal & Company, for performing services required by the Agreement.  (*See* Agreement ¶ 1.38.)

B.    **Incentive Award for Class Representative**: Defendants have agreed, subject to Court approval, to pay Class Representative Victor Lozano an incentive award of $15,000, in addition to any award he will receive through the Agreement.  (*See* Agreement ¶¶ 1.38 & 8.3.)

   **C.** **Payment of Attorneys' Fees:** Defendants have agreed not to object to or otherwise challenge Class Counsel's request at Section VI, for an amount of up to $3,750,000 for attorneys' fees and reimbursement of expenses to be paid from the Settlement Fund, subject of course to the Court's approval.[4] (*See* Agreement ¶¶ 1.38 & 8.1-8.2.)

  **4.** *The Release.* Should the Court grant final approval to the Agreement, Defendants, and certain independent contractors, and each of their related and affiliated entities will receive a full release of all claims related to the transmission of text messages advertising the DVD release of the motion picture *Robots* to the above-defined class. (*See* Agreement ¶¶ 1.28-1.30 & 3.1-3.2 for a description of the complete release language.)

**III.** **THE IMPLEMENTED NOTICE PLAN COMPORTS WITH DUE PROCESS**

  The parties, through professional settlement administrator Rosenthal & Company, have fully complied with this Court's Order directing notice to the Class. Rule 23 requires the class receive "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B); *accord Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173 (1974); *see also In re AT&T Mobility Wireless Data Services Litig.*, 270 F.R.D. 330, 351 (N.D. Ill. 2010). "Neither Rule 23 nor due process require 'receipt of actual notice by all class members;' rather, 'notice should be mailed to the last known addresses of those who can be identified and publication used to notify the others.'" *Mangone v. First USA Bank*, 206 F.R.D. 222, 231-32 (S.D. Ill. 2001) (internal citations omitted); *see also Burns v. Elrod*, 757 F.2d 151, 154 (7th Cir. 1985) (noting that "Rule 23 does not require defendants to exhaust every conceivable method of identification"). In situations where individual notice is not feasible, notice in newspapers throughout the country is an

---

[4] The Court's final approval of the Agreement should be analyzed separately and is not contingent upon its approval of the Attorneys' fee requested by Class Counsel.

adequate substitute; however, the Seventh Circuit has recognized that the "World Wide Web is an increasingly important method of communication, and . . . an increasingly important substitute for newspapers." *Mirfasihi v. Fleet Mortg. Corp.*, 356 F.3d 781, 786 (7th Cir. 2004). Here, the Court-approved notice utilized a combination of direct mail notice, print newspaper publication, website publication notice, and inventive targeted on-line advertising. Because the parties have fully complied with the approved notice plan, the Court should affirm its finding at preliminary approval that the forms and methods of notice were "best notice practicable under the circumstances, and . . . complies fully with the requirements of the Federal Rules of Civil Procedure . . . and meets the requirements of Due Process." (Dkt. 57, ¶ 1.)

Realizing the potential difficulty in giving proper notice to the Class when the only information known about the potential class members was a list of their cellular phone numbers, the Parties retained Rosenthal and Company ("Rosenthal"), a professional Claims Administrator specializing in administering and marketing class action settlements with experience in providing proper notice with similar class member information. (*See* Declaration of Daniel Rosenthal ¶¶ 2-4, a true and accurate copy of which is attached as Exhibit 3.) After being apprised of the nature of the litigation, Rosenthal developed a comprehensive notice plan specifically designed to reach as many members of the class as possible through various methods. (*See* Rosenthal Decl. ¶ 5.)

The notification plan implemented by Rosenthal and approved by the Court included: (1) direct mailed notice to all class members identified by a "reverse" address search using a list of all cell phone numbers in the Parties' possession to which the allegedly offending text message was sent; (2) published notice in multiple major market newspapers nationwide, including the National edition of *USA Today* and in a double issue of *Entertainment Weekly*; (3) National Internet Advertising using the Google Content Network displaying ads on the thirty most popular

websites among likely adult class members; and (4) the posting of a web page providing information about the settlement and how to obtain claim forms. (Rosenthal Decl. ¶¶ 5-8, 12-14.) Additionally, there was a press release concerning the Settlement issued via PR Newswire. (Rosenthal Decl. ¶ 17; Edelson Decl. ¶ 12.) In addition to the notice contemplated by the parties, the news of the settlement was reported in numerous publications across the country and on the Internet. (Edelson Decl. ¶ 12.)

Each of the summary notices and the press release directed class members to the Court-approved "long form" notice that was published to the Internet by Rosenthal at www.LozanoTextSettlement.com on or about November 24, 2010 (and will remain posted until claims are paid to class members). (Rosenthal Decl. ¶¶ 6, 12, 17; Edelson Decl. ¶ 12-13.) On the settlement website Class Members are able to file claims online, print customized claim forms to be mailed to Rosenthal, and are review documents filed with the Court in this case, Class Members. (Rosenthal Decl. ¶ 7.)

Finally, on November 24, 2010, in compliance with the Class Action Fairness Act, 28 U.S.C. §1715 (b), Rosenthal mailed a letter, prepared by Defendants' counsel, as well as other required court documents to the Attorney General or other appropriate official of each state and U.S. territory giving notice of the Settlement Agreement. (Rosenthal Decl. ¶ 5.)

In sum, the notice was provided to all those reasonably ascertainable by available information and in the best method practicable to all others and comports with Due Process and Rule 23.

## IV.     THE SETTLEMENT WARRANTS FINAL APPROVAL

Under Federal Rule of Civil Procedure 23(e), "claims, issues, or defenses of a certified class may be settled . . . only with the court's approval." Fed. R. Civ. P. 23(e). In cases where

the settlement "would bind class members, the court may approve [the settlement] only after a hearing and finding that it is fair, reasonable, and adequate." Fed R. Civ. P. 23(e)(2). "Federal courts naturally favor the settlement of class action litigation." *Isby v. Bayh*, 75 F.3d 1191, 1196 (7th Cir. 1996) (citing *E.E.O.C. v. Hiram Walker & Sons, Inc.,* 768 F.2d 884, 888-89 (7th Cir. 1985)). Thus, the Seventh Circuit has found that a District Court's inquiry as to whether to grant approval "is limited to [the consideration of] whether the proposed settlement is lawful, fair, reasonable and adequate." *Uhl v. Thoroughbred Tech. & Telecomms., Inc.,* 309 F.3d 978, 986 (7th Cir. 2002) (citing *Isby*, 75 F.3d at 1198-99).

To properly evaluate the fairness of a settlement, a district court must consider the following five factors:

> [1] the strength of plaintiffs' case compared to the amount of defendants' settlement offer, [2] an assessment of the likely complexity, length and expense of the litigation, [3] an evaluation of the amount of opposition to settlement among affected parties, [4] the opinion of competent counsel, and [5] the stage of the proceedings and amount of discovery completed at the time of settlement.

*Synfuel Techs., Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646, 653 (7th Cir. 2006) (internal citations omitted) (citing *Isby,* 75 F.3d at 1199); *accord In re JPMorgan Chase & Co. Sec. Litig.,* No. 06 C 4674, 2009 WL 537062, at *4 (N.D. Ill. Mar. 3, 2009). Each factor here militates in favor of final approval.

### 1. The Strength of the Plaintiff's Case Compared to Settlement Weighs in Favor of Granting Approval.

"The first and most important consideration is the strength of the plaintiffs' case compared to the value of the settlement." *In re Lawnmower Engine Horsepower Mktg. & Sales Practices Litig.*, 733 F. Supp. 2d 997, 1005 (E.D. Wis. 2010) (citing *Synfuel*, 463 F.3d at 653). In considering the strength of the plaintiff's case, the Court should quantify "the net expected value of continued litigation to the class," by estimating "the range of possible outcomes." *In re*

*AT&T Mobility*, 270 F.R.D. at 346-47 (internal citations omitted); *accord Synfuel,* 463 F.3d at 653.  In weighing this factor, the Court "should consider the vagaries of litigation and compare the significance of immediate recovery by way of the compromise to the mere possibility of relief in the future, after protracted and expensive litigation."  *Lipuma v. Am. Express Co.*, 406 F. Supp. 2d 1298, 1323 (S.D. Fla. 2005).  Finally, "[b]ecause the essence of settlement is compromise courts should not reject a settlement solely because it does not provide a complete victory to the plaintiffs."  *In re AT&T Mobility*, 270 F.R.D. at 347 (internal quotations omitted).

The TCPA allows for the receipt of "$500 in damages for each such violation," and in the absence of proof of willfulness, represents the upper limit of damages from a favorable verdict and is a statutory cap on the maximum potential recovery for the class.  *See* 47 U.S.C. § 227(b)(3)(B).  Further, this Court has agreed with the Federal Communications Commission's "interpretation that § 227 of the TCPA applies to text messages" and rejected several other arguments presented by Defendants for dismissal.  (Dkt. 40, pgs. 11-15.)  Other courts have made similar findings.  *Abbas v. Selling Source, LLC,* No. 09 CV 3413, 2009 WL 4884471, at *7 (N.D. Ill. Dec. 14, 2009) ("The court concludes that an SMS message is a 'call' within the meaning of the TCPA."); *Satterfield v. Simon & Schuster,* 569 F.3d 946, 952 (9th Cir. 2009) ("[W]e hold that a text message is a 'call' within the meaning of the TCPA.");[5] *Kramer v. Autobytel, Inc*, --- F. Supp. 2d. ---, No. 10-cv-2722 CW, 2010 WL 5463116 (N.D. Cal. Dec. 29, 2010).  As such, Plaintiff and Class Counsel believe the merits of the claim at issue are strong, as is the likelihood of obtaining a complete victory.  (Edelson Decl. ¶ 5.)

In the absence of settlement, however, Plaintiff is cognizant that the "range of possible

---

[5] *See also In re Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 18 FCC Rcd 14014, 14115, 165, 2003 WL 21517853 (2003) (finding that the TCPA prohibition "encompasses both voice calls and text calls, … [*e.g.*,] short message service (SMS) calls").

outcomes" certainly includes a number of unfavorable outcomes. Defendants are represented by highly skilled counsel and continued litigation in this case could result in a finding from this Court or the Seventh Circuit that the TCPA does not apply to the text message ads at issue, which would provide no relief to the Class. Further, Defendants raised several affirmative defenses and presented several potential factual hurdles during mediation, any of which, if successful, could result in no relief to the class. (*Id.*)

Although Plaintiff believes that his TCPA claim is strong on the merits, given the potential for unfavorable outcomes in the case, the propitious amount of beneficial relief providing $200 to each class member submitting a claim weighs heavily in favor of granting final approval of the settlement. *See Lipuma*, 406 F. Supp. 2d at 1323 ("[I]t has been held proper to take the bird in hand instead of a prospective flock in the bush."). Weighing the strength of Plaintiff's claim and potential risks involved with continued litigation, against the exceptional results for the class provided by the Agreement, this first factor strongly supports final approval of the settlement.

## 2. *The Likelihood of an Increase in the Complexity, Length, and Expense of Continued Litigation Validates the Approval of the Settlement.*

Final approval of a settlement is favored where "continued litigation would require resolution of complex issues at considerable expense and would absorb many days of trial time." *In re Mexico Money Transfer Litig.,* 164 F. Supp. 2d 1002, 1019 (N.D. Ill. 2000) (finding that settlement is favored where further litigation would require additional written discovery, depositions and expert discovery, and where appellate practice is likely to result); *accord Isby,* 75 F.3d at 1199.

Continued litigation in this case would most certainly result in an increase in the complexity of the issues to resolve, the duration of the lawsuit, and an increase in the expenses

incurred by both parties. This class action involves relatively new legal issues regarding the

TCPA that have yet to be presented to the Seventh Circuit Court of Appeals. (Edelson Decl. ¶

6.) In light of such complexity and the amount potential statutory damages at issue, the defeated

party is likely to appeal, which will further delay the date of resolution. (*Id.*) All of the parties

will incur additional expenses if the settlement is not approved, including the costs of further

discovery, the retention of expert witnesses, the filing of and defending further pre-trial motions,

and the great expense of conducting a class action trial. Evidence and witnesses from across the

country would have to be convened, adding additional expense to the litigation. (*Id.*) Thus,

factor two weighs in favor of approving the settlement.

**3.      *There has been no Opposition to the Settlement.***

The lack of objectors challenging the settlement favors a finding that the settlement is

"fair and reasonable." *Am. Civil Liberties Union v. United States Gen. Servs. Admin.*, 235 F.

Supp. 2d 816, 819 (N.D. Ill. 2002). The fact that not one class member filed an objection to the

settlement, is "strong circumstantial evidence favoring settlement." *In re Mexico Money*

*Transfer Litig.*, 164 F. Supp. 2d at 1020-21. Here, not one person has objected to the settlement

and only four purported requests for exclusion from the Agreement were received,[6] and the

deadline for filing exclusions and objections to the settlement was February 15, 2011.

(Rosenthal Decl. ¶¶ 15-16.) In addition, Defendant provided proper notice of the Agreement to

---

[6] Three individuals who stated that they never received the Text Message at issue or did not own the cell phone number in question at the time sent letters purporting to be requests for exclusion. According to their own representations, these individuals were not potential class members and therefore there is no need for them to be excluded from the Agreement. Plaintiff and Defendant disagree about the request sent by George Ridgeway. (*See* Rosenthal Decl. ¶ 23, Ex. I.) Mr. Ridgeway requests to be excluded from the Agreement, but submitted a telephone number that number that did not appear on the class list. The terms of the Agreement require the inclusion of the cell phone number that received the text message to be present on any exclusion request. Plaintiff believes that because Mr. Ridgeway substantially complied with terms of the Agreement and Notice regarding opting out, that his request for exclusion should be honored.

the appropriate state and federal officials pursuant to the Class Action Fairness Act of 2005

("CAFA"), 28 U.S.C. § 1715 and no comments or opposition from those governmental entities

was received. (Rosenthal Decl. ¶ 5; Edelson Decl. ¶ 15.) "Although CAFA does not create an

affirmative duty for either the state or federal officials to take any action in response to a class

action settlement, CAFA presumes that, once put on notice, state or federal officials will raise

any concerns that they may have during the normal course of the class action settlement

procedures." *Garner v. State Farm Mut. Auto. Ins. Co.*, CV-08-1365 CW (EMC), 2010 WL

1687832, *14 (N.D. Cal. Apr. 22, 2010).

Additionally, attorneys and staff at Edelson McGuire spoke with thousands Class

Members about the settlement in exercise of their fiduciary duties to the Class. (Edelson Decl. ¶

14.) Notably, none of the Class Members with whom Class Counsel spoke objected to the terms

of the Settlement, and hundreds verbally expressed approval of the terms of the Settlement and

requested that claim forms be mailed to them. (*Id.*) This lack of opposition further supports

granting final approval of the settlement.

    **4.**    ***The Opinion of Competent Counsel Favors Approval.***

Courts are entitled to rely on the opinion of competent Class Counsel that the settlement

is fair, reasonable and adequate, where Class Counsel are qualified, and where discovery and

settlement negotiations are extensive and thorough. *See Isby*, 75 F.3d at 1200; *see also*

*Hispanics United v. Vill. of Addison*, 988 F. Supp. 1130, 1150 n. 6 (N.D. Ill. 1997) (noting that a

"strong initial presumption of fairness attaches" where the settlement is "the result of arm's

length negotiations," and where plaintiffs' counsel are "experienced and have engaged in

adequate discovery").

Class Counsel have extensive knowledge and experience in litigating consumer class

actions, have pioneered the application of the TCPA to emerging text messaging technology, and were pitted against highly experienced defense counsel who promised to continue to mount a formidable defense. (*See* Edelson Decl. ¶¶ 3, 17.) Furthermore, the Agreement was finalized only after extensive arm's length negotiations in a formal mediation with Judge Politan and after Plaintiff was given access to sufficient informal discovery to fairly and effectively negotiate a settlement on behalf of the class. (Edelson Decl. ¶¶ 7-8.) Faced with the prospect of receiving nothing should Defendants succeed in any aspect of what assuredly would have been a vigorous defense absent settlement, Class Counsel are confident that payment of $200 per class member is an exceptional result in this litigation. (*See* Edelson Decl. ¶¶ 4-5, 17.)

### 5. *The Stage of the Proceedings and the Amount of Discovery Completed Weigh in Favor of Final Approval of the Settlement.*

Approval of a settlement is proper where "discovery and investigation conducted by class counsel prior to entering into settlement negotiations was 'extensive and thorough.'" *Isby*, 75 F.3d at 1200; *accord Mangone*, 206 F.R.D. at 226.[7] "The lack of [formal] discovery prior to settlement, however, does not preclude a court from approving a settlement," especially where "counsel have conducted a significant amount of informal discovery and dedicated a significant amount of time and resources to advancing the underlying lawsuits." *In re AT&T Mobility*, 270 F.R.D. at 350 (internal citation omitted).

Prior to engaging in serious settlement discussions, the Parties were initially able to explore the strengths and weaknesses of their respective positions through briefing on a motion to dismiss. (*See* Dkt. Nos. 15, 26, 37.) Further, settlement discussions only commenced after

---

[7] In fact, Courts "have often seen cases which were 'over discovered.' In addition to wasting the time of [the] Court, the parties and their attorneys, it often adds unnecessarily to the financial burden of litigation and may often serve as a vehicle to harass a party. Discovery in its most efficient utilization should be totally extra-judicial…. Being an extra judicial process, informality in the discovery of information is desired." *Lipuma*, 406 F. Supp. 2d at 1324.

significant investigation into Plaintiff's claim and after the parties entered into a pre-mediation informal discovery agreement to exchange certain documents and other information that allowed the parties to effectively engage in the mediation process. (Edelson Decl. ¶ 7.) Accordingly the final factor is weighs in favor of approval and each of the five *Synfuel* factors support a finding that the settlement is fair, reasonable, and adequate making final approval of the settlement warranted.

Finally, the fairness, reasonableness, and adequacy of the instant settlement is further supported by the approval of similar class action settlements in this District, in the Northern District of California, and in the Southern District of Florida. *See Weinstein v. The Timberland Co. et al.*, No. 06-cv-00484 (N.D. Ill.) (approving settlement creating a $7 million settlement fund for the transmission of 40,000 text messages entitling each class member to a $150 settlement payment); *Satterfield v. Simon & Schuster, Inc. et al.*, No. 06-cv-02893-CW (N.D. Cal.) (approving settlement creating a $10 million settlement fund for the transmission of 59,000 text messages entitling each class member to a $175 settlement payment). Accordingly, the proposed Agreement, which creates a $16 million settlement fund where each recipient of the allegedly unauthorized *Robots* text message advertisement is entitled to a $200 settlement payment, is equally fair, reasonable, and adequate, and warrants Court approval.

## V.  ATTORENYS' FEES & INCENTIVE AWARDS

### 1.  *The Requested Attorneys' Fees are Reasonable Whether Calculated Under Either the Percentage of the Benefit Analysis or the Lodestar Method.*

In deciding an appropriate fee in common fund cases, the Seventh Circuit has "consistently directed district courts to 'do their best to award counsel the market price for legal services, in light of the risk of nonpayment and the normal rate of compensation in the market at the time.'" *Sutton v. Bernard*, 504 F.3d 688, 692 (7th Cir. 2007) (*quoting In re Synthroid Mktg.*

*Litig.*, 264 F.3d 712, 718 (7th Cir. 2001) ("*Synthroid I*")); *see also Montgomery v. Aetna Plywood, Inc.*, 231 F.3d 399, 408 (7th Cir. 2000) (finding that in common fund cases, "the measure of what is reasonable [as an attorney fee] is what an attorney would receive from a paying client in a similar case"); *In re Trans Union Corp. Privacy Litig.*, MDL 1350, No. 00 C 4279, 2009 WL 4799954, at *9 (N.D. Ill. Dec. 9, 2009) *order modified and remanded*, 629 F.3d 741 (7th Cir. 2011) ("The analysis should be determined from what an arms-length negotiation between the class and the lawyers at the beginning of the case would have likely produced."); *Taubenfeld v. AON Corp.*, 415 F.3d 597, 599 (7th Cir. 2005) ("Although is it impossible to know *ex post* exactly what terms would have resulted from arm's-length bargaining *ex ante*, courts must do their best to recreate the market by considering factors such as actual fee contracts that were privately negotiated for similar litigation . . . .") (*citing Synthroid I*, 264 F.3d at 719)).

This rule "is based on the equitable notion that those who have benefited from litigation should share in its costs." *Sutton*, 504 F.3d at 691-92, (*citing Skelton v. Gen. Motors Corp.*, 860 F.2d 250, 252 (7th Cir. 1988); *see also Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980) (class lawyers who secure fund are entitled to payment from the fund to avoid unjustly enriching those who benefit from class counsel and the class representatives' efforts).

Accordingly, although awarding attorneys' fees based on a percentage of the recovery or Class Counsel's lodestar remains within the discretion of the district court, *In re Trans Union Corp.*, 2009 WL 4799954, at *9 (*citing Florin v. Nationsbank of Ga., N.A.*, 34 F.3d 650, 566 (7th Cir. 1994), "[t]he approach favored in the Seventh Circuit is to compute attorney's fees as a percentage of the benefit conferred upon the class" especially where the percentage accurately reflects the market. *Williams v. Gen. Elec. Capital Auto Lease*, 94 C 7410, 1995 WL 765266, *9 (N.D. Ill. 1995); *see also Sutton*, 504 F.3d at 693 (directing district court on remand to consult

the market for legal services so as to arrive at a reasonable percentage) (*citing Missouri v. Jenkins*, 491 U.S. 274, 285 (1989) (stating that in determining attorneys' fees, "we have consistently looked to the marketplace as our guide to what is 'reasonable'")).

The contingent nature of the fees here supports an award based on the common benefit approach. The fee agreements between Class Counsel and the Class Representatives are contingent in nature. (Edelson Decl. ¶ 16.) It has been stated that in commercial, non-class litigation, attorneys regularly negotiate contingent fee arrangements, which result in a fee of between 33.3% to 40% of the recovery. *Retsky Family Ltd. P'ship v. Price Waterhouse LLP*, 97 C 7694, 2001 WL 1568856, at *4 (N.D. Ill. Dec. 10, 2001) (*citing Kirchoff v. Flynn*, 786 F.2d 320, 324 (7th Cir. 1986); *see also* Richard Posner, Economic Analysis of Law § 21.9, at 534-35 (3d ed. 1986) (explaining established practice to reward attorneys for taking the risk of non-payment by paying them a premium over their normal hourly rates for winning[8] contingency cases).

Additionally, Class Counsel assumed a substantial risk of non-payment given the novelty of the action and the Defendants' position that it stood ready at all times to vigorously defend the lawsuit. (Edelson Decl. ¶ 17.) In light of the significant likelihood that Class Counsel (and Class Members) could have ultimately recovered nothing, Class Counsel had every incentive to litigate this matter in the most efficient manner possible.

The magnitude of the recovery for the Class Members is further suggestive of an award based on the common benefit approach. Class Members who submit valid claims are entitled to

---

[8] That this case settled is irrelevant, as courts have made clear that if, by their skill and determined efforts, plaintiffs' counsel ultimately secure a settlement, that fact does not diminish the risk they assumed at the case's inception. *See Skelton*, 860 F.2d at 258 (7th Cir. 1988) ("The point at which plaintiffs settle with defendants . . . is simply not relevant to determining the risks incurred by their counsel in agreeing to represent them.")

$200 cash payments, or their *pro rata* share of the $16,000,000[9] settlement fund in the event the approved claims, attorneys' fees, and settlement notice and administration costs exceed the total amount of the fund.

Finally on this point, that none of the Class members have objected to the amount of the requested fees is testament to the reasonableness of the request. The lack of objection to the fee request is meaningful here because the day has long since passed when class members simply accepted the amount of proposed fees in an otherwise acceptable settlement. The common benefit approach is appropriately applied to the instant settlement and the inquiry turns to what percentage would be appropriate given the market for legal fees.

A. **The Requested Fees Represent Under 25% of the Common Benefit Provided to the Class—a Percentage Well Below Market and the Range that has been Found Reasonable by the Courts.**

The negotiated fee amount in this case equals just over 23% of the cash common fund created under the settlement. Such a figure is widely recognized as a reasonable percentage—in fact, well below the norm. *See Meyenburg v. Exxon Mobil Corp.*, No. 05-cv-15 DGW, 2006 WL 2191422, at *2 (S.D. Ill. July 31, 2006) ("33 1/3% to 40% (plus the cost of litigation) is the standard contingent fee percentages in this legal marketplace for comparable commercial litigation"). Indeed, using the market percentage method in the courts of the Seventh Circuit, as one court has observed, results in awards of attorney's fees "equal to approximately one-third or more of the recovery." *Teamsters Local Union No. 604 v. Inter-Rail Transport, Inc.*, 02-cv-1109 DRH, 2004 WL 768658, at *1 (S.D. Ill. Mar. 19, 2004) ("In this Circuit, a fee award of thirty-

---

[9] Absent extenuating circumstances, fees are based on the benefit made available to the class, as opposed to the amounts actually claimed. This approach promotes the deterrence goals of class actions. *See, e.g.*, *Boeing*, 444 U.S. at 480; 2 Newberg on Class Actions § 1.18 (3d Ed.1992) ("[I]t is now settled that class counsel may seek a fee award based on the total potential benefit to the class, rather than being limited by the total amount of claims actually exercised by class members.")

three and one-third (33 1/3%) in a class action in [sic] not uncommon"); *see also In re Mexico Money Transfer Litig.*, 164 F. Supp. 2d at 1033 (recognizing "the established 30% benchmark for an award of fees in class actions."); *Spicer v. Chicago Bd. Options Exch., Inc.*, 844 F. Supp. 1226, 1251-52 (N.D. Ill. 1993) (awarding 29% of a common fund); *Gaskill v. Gordon*, 160 F.3d 361, 362-363 (7th Cir. 1998) (noting that typical contingency fees are between 33% and 40% and that "[s]ome courts have suggested 25% as a benchmark figure for a contingent-fee award in a class action"). These figures are also in accord with a Federal Judicial Center Study that found that in federal class actions, median attorney fee awards were in the range of 27% to 30%. Thomas E. Willging, Laural L. Hooper & Robert J. Niemic, *Empirical Study of Class Actions in Four Federal District Courts: Final Report to the Advisory Committee on Civil Rules*, at 69 (Federal Judicial Center 1996).

The going rate in the market for class action legal fees clearly suggests a fee substantially in excess of the fee requested here. Nevertheless, Class Counsel specifically agreed to limit their fee request to $3.75 million, and that in no event would the Defendants be required to pay more than that amount in fees and expenses. Given the constraints imposed by the parties' stipulation, then, a fee award of 23.4% is well below the market rate and facially reasonable.

**B.    The Requested Fees are Equally Appropriate Under the Lodestar Method.**

The agreed-upon attorneys' fees are equally reasonable should the Court apply the lodestar method. To determine the reasonableness of attorneys' fees under the lodestar method, the first step is to "multiply[] a reasonable hourly rate by the number of hours reasonably expended." *Gastineau v. Wright,* 592 F.3d 747, 748 (7th Cir. 2010) (*citing Hensley v. Eckerhart,* 461 U.S. 424, 433-37 (1983)). A reasonable hourly rate should be in line with the prevailing rate in the "community for similar services by lawyers of reasonably comparable skill, experience

and reputation." *Jeffboat, LLC v. Director, Office of Workers' Comp. Programs*, 553 F.3d 487, 489 (7th Cir. 2009); *see also Denius v. Dunlap*, 330 F.3d 919, 930 (7th Cir. 2003) (finding the attorney's actual billing rate for comparable work is presumptively appropriate).

Oftentimes, the base lodestar is adjusted using a multiplier to take into account various factors in the litigation that affect the reasonableness of the requested fees. *See, e.g., Cook v. Niedert,* 142 F.3d 1004, 1015 (7th Cir. 1998); *Skelton*, 860 F.2d at 255. These factors include "the complexity of the legal issues involved, the degree of success obtained, and the public interest advanced by the litigation." *Gastineau*, 592 F.3d at 748. When applying a multiplier to the base lodestar amount, courts should also consider the risk plaintiff's counsel assumes in recovering nothing. *Harman v. Lyphomed, Inc.*, 945 F.2d 969, 975-76 (7th Cir. 1991) (remanding case for recalculation of attorneys fees because the trial court failed to award a risk multiplier.) Typical multipliers awarded in comparable class action litigation average around 4, but are often much higher. *In re Linerboard Antitrust Litig.*, No. 98-5055, 2004 WL 1221350, at *14 (E.D. Pa. Jun. 2, 2004) (recognizing that from 2001 to 2003, the average multiplier approved in common fund cases was 4.35).[10] Here, Class Counsel's base lodestar is reasonable and

---

[10] *Stop & Shop Supermarket Co. v. SmithKline Beecham Corp.*, No. 03-4578, 2005 WL 1213926, at *18 (E.D. Pa. May 19, 2005) (approving lodestar multiplier of 15.6); *In re Xcel Energy, Inc., Sec., Derivative & "ERISA" Litig.*, 364 F. Supp. 2d 980, 999 (D. Minn. Apr. 8, 2005) (approving lodestar multiplier of 4.7); *In re Rite Aid Corp. Sec. Litig.*, 146 F. Supp. 2d 706, 736, n.44 (E.D. Pa. 2001) (finding fee award equivalent to 4.5 to 8.5 lodestar multiplier "unquestionably reasonable"); *Roberts v. Texaco, Inc*., 979 F. Supp. 185, 197 (S.D.N.Y. 1997) (approving lodestar multiplier of 5.5); *In re AremisSoft Corp. Sec. Litig.*, 210 F.R.D. 109, 135 (D.N.J. 2002) (approving lodestar multiplier of 4.3); *Di Giacomo v. Plains All Am. Pipeline*, No. H-99-4137, 2001 WL 34633373, at *10-11 (S.D. Tex. Dec. 19, 2001) (approving percentage fee that resulted in multiplier of 5.3); *Ryan v. City of Chicago*, 274 Ill. App. 3d 913, 919, 654 N.E.2d 483, 487 (1995) (approving fee award of 33% of common fund, which court stated for comparative purposes only, resulted in a multiplier of 4); *Cohn v. Nelson*, 375 F. Supp. 2d 844, 862 (E.D. Mo. 2005) ("courts typically apply a multiplier of 3 to 5 to compensate counsel for the risk of contingent representation"); *In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465, 489 (S.D.N.Y. 1998) (approving fee equaling a multiplier of 3.97, and noting that "in recent years multipliers of between 3 and 4.5 have become common"); *Maley v. Del Global Tech. Corp.* 186

success obtained for the class given the risk taken in prosecuting this case justify a moderate

multiplier.

Class Counsel's adjusted-lodestar[11] in the instant case is reflected in the following chart:

| ATTORNEY (position) | YEARS OF PRACTICE | HOURS | HOURLY RATE | TOTAL |
|---|---|---|---|---|
| J. Edelson (Managing Partner: Edelson McGuire) | 15 years | 156.4 | $600 | $93,840.00 |
| M. McGuire (Partner: Edelson McGuire) | 10 years | 617.7 | $550 | $339,735.00 |
| R. Andrews (Partner: Edelson McGuire) | 6 years | 402.6 | $450 | $181,170.00 |
| S. Teppler (Partner: Edelson McGuire) | 31 years | 41.90 | $600 | $25,140.00 |
| M. McMorrow (Partner: Edelson McGuire) | 11 years | 175.4 | $470 | $82,438.00 |
| Steven L. Woodrow (Partner: Edelson McGuire) | 6 years | 44.2 | $450 | $19,890.00 |
| J. Ochoa (Associate Edelson McGuire) | 1 year | 60.20 | $295 | $17,759.00 |
| L. Davenport (Associate Edelson | 2 years | 127.10 | $325 | $41,307.50 |

F. Supp. 2d 358, 371 (S.D.N.Y. 2002) ("the modest multiplier of 4.65 is fair and reasonable" and "well within the range awarded by courts . . . throughout the country"); *In re Cenco, Inc. Sec. Litig.*, 519 F. Supp. 322, 326-028 (N.D. Ill. 1981) (multiplier of 4.0); *Arenson v. Board of Trade of City of Chicago*, 372 F. Supp. 1349, 1359 (N.D. Ill. 1974) ("award of four times the hourly rate of the plaintiffs' attorneys is meant to adequately compensate them for initiating this significant litigation and negotiating such a beneficial settlement for the class . . . .")

[11] Prior to submission, Class Counsel reviewed the hours expended by the attorneys and staff of Edelson McGuire and reduced any hours deemed even remotely duplicative or excessive. (Edelson Decl. ¶ 16.)

| | | | | |
|---|---|---|---|---|
| McGuire) | | | | |
| D. Marovitch (Attorney Edelson McGuire) | 1 year | 366.00 | $260 | $95,160.00 |
| Edelson McGuire Staff Attorneys | 1 year | 889.4 | $210 | $186,774 |
| Edelson McGuire Law Clerks | N/A | 213.8 | $210 | $44,898 |
| **TOTAL** | | **3,094.7** | | **$1,128,111.50** |

(Edelson Decl. ¶¶ 16, 21.)

The hourly rates utilized by Edelson McGuire, LLC attorneys and legal staff are comparable to rates charged by attorneys with similar experience, skill and reputation, for similar services in the Chicago legal market and comparable markets nationwide. (Edelson Decl. ¶¶ 20-21.) The hourly rates listed in the chart above are the actual billing rates for the respective attorneys that they charge to hourly clients, and, therefore, yield a presumption of appropriateness. *See, e.g., Denius,* 330 F.3d at 930. Further, several state and federal courts have approved Edelson McGuire's then-current hourly rates as reasonable. (Edelson Decl. ¶ 20.)

Before considering the expenses Class Counsel incurred prosecuting this matter, it is apparent that a multiplier of 2.9 to the base lodestar is warranted in this case. Class Counsel's willingness to undertake this litigation was risky, and despite such risk, an exceptional result was achieved for the class. Plaintiff's claims were largely untested and the amount in controversy was substantial, and Class Counsel agreed to commence this litigation knowing they would assuredly face significant opposition. (Edelson Decl. ¶ 17.) Indeed, throughout the litigation Defendants' counsel mounted a vigorous opposition. (Edelson Decl. ¶¶ 5, 17.) As noted above, the rates employed by Class Counsel are their normal billing rates and they would not have brought this action absent the prospect of a multiplier on their actual fees expended to account

22

for the risk inherent in this type of class action. (Edelson Decl. ¶¶ 17, 20.) Analysis of novel issues, significant investigation, discovery, and careful and extended negotiation of the final settlement agreement were required to ensure a substantial benefit to class, and that is in fact what the class got. (Edelson Decl. ¶¶ 8-10, 18.) Accordingly, Class Counsel's base lodestar of $1,128,111.50 warrants a multiplier of at least the roughly 2.9 that is effectively requested here, which is commonly awarded and reasonable given the result obtained.

In addition to this amount, or such other amount awarded by Your Honor, Class Counsel have expended $15,743.80 in reimbursable expenses, such as filing fees, appearance fees, expert consulting charges, travel, copying, case administration, and ordering of deposition transcripts, with more expenses yet to come. (Edelson Decl. ¶ 22.) Therefore, Class Counsel requests the Court approve as reasonable the agreed-upon fees and expenses of $3,750,000.

Hence, under either the percentage of the fund method or the lodestar method Class Counsel's fee request is reasonable in this case. More importantly, the requested fee award follows binding Seventh Circuit precedent in that it is accurately reflective of and consistent with—indeed, is appreciably below—what the market would award. Accordingly, this Court ought to award the request for attorneys' fees and expenses of $3,750,000.

**2.** ***The Incentive Award to the Class Representative is Reasonable and Should be Approved.***

Because a named plaintiff is essential to any class action, "[i]ncentive awards are justified when necessary to induce individuals to become named representatives." *Synthroid I,* 264 F.3d at 722-23. In deciding whether an incentive award is warranted, courts look to: (1) "the actions the plaintiff has taken to protect the interests of the class"; (2) "the degree to which the class has benefitted from those actions"; and (3) "the amount of time and effort the plaintiff expended in pursuing the litigation." *Cook,* 142 F.3d at 1016. These factors are readily satisfied, in the

instant action, because the class benefitted significantly from Mr. Lozano's involvement as the

Class Representative.  Were it not for Mr. Lozano's efforts and contributions to the litigation by

assisting Class Counsel with their investigation and filing of his TCPA claim, and in preparing

both informal pre-mediation discovery answers and formal discovery responses, the substantial

benefit to the class afforded under this Settlement agreement would not have resulted.  (Edelson

Decl. ¶ 24-25.)  Further, Courts have approved incentive awards in similar class action litigation

under the TCPA consistent with and greater than the agreed-upon $15,000 award here.  (*See*

*Satterfield*, No. 06-cv-02893-CW, Dkt. 132; *Weinstein*, No. 06-cv-00484, Dkt. 93.)

Accordingly, the agreed-upon incentive award of $15,000 is reasonable and should be approved.

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiff respectfully request that the Court grant final

approval to the Agreement.  A Proposed Order shall be separately submitted by email for the

Court's consideration in advance of the April 15, 2011 final fairness hearing.


Dated: April 1, 2011                                      Respectfully Submitted,

                                                          VICTOR LOZANO,
                                                          individually and on behalf of a
                                                          class of similarly situated individuals,

                                                           /s/ Ryan D. Andrews

                                                          Jay Edelson
                                                          Myles McGuire
                                                          Ryan D. Andrews
                                                          Michael J. McMorrow
                                                          EDELSON MCGUIRE LLC
                                                          350 N. LaSalle St., Ste. 1300
                                                          Chicago, Illinois 60654

24

## CERTIFICATE OF SERVICE

I, Ryan D. Andrews, an attorney, certify that on April 1, 2011, I served the above and foregoing ***Plaintiff's Uncontested Motion & Memorandum in Support of Final Approval of Class Action Settlement, Approval of Attorneys' Fees, and Incentive Award*** by causing true and accurate copies of such papers to be filed and transmitted to the persons shown below via the Court's CM/ECF electronic filing system.

Marc Eric Rosenthal
John Andrew Sloat
Catherine J. Spector
Proskauer Rose LLP
70 W. Madison, Suite 380
Chicago, IL 60602
mrosenthal@proskauer.com
jsloat@proskauer.com
cspector@proskauer.com
312-962-3530

       /s/ Ryan D. Andrews

          Ryan D. Andrews